# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION AT DAYTON

ELEAZAR FLORES-LOPEZ,

            Petitioner,        :      Case No. 3:18-cv-330

  - vs -                        District Judge Walter H. Rise
                               Magistrate Judge Michael R. Merz

TIM SHOOP, Warden,
  Chillicothe Correctional Institution

                              :

            Respondent.

## REPORT AND RECOMMENDATIONS

This habeas corpus case is brought *pro se* by Petitioner Eleazar Flores-Lopez to obtain relief from his conviction in the Montgomery County Court of Common Pleas for aggravated possession of drugs, to wit, over 100 times the bulk amount of methamphetamines. The case is before the Court for initial review under Rule 4 of the Rules Governing § 2254 Proceedings, which provides:

> The clerk must promptly forward the petition to a judge under the court's assignment procedure, and the judge must promptly examine it. If it plainly appears from the petition and any attached exhibits that the petitioner is not entitled to relief in the district court, the judge must dismiss the petition and direct the clerk to notify the petitioner.

This Court assignment procedure provides that all habeas corpus petitions will be referred to a United States Magistrate Judge for case management and a report and recommendations to the assigned District Judge who in this case is The Honorable Walter H. Rice.

1

Petitioner pleads[1] two Grounds for Relief:

> **Ground One:** Petitioner was denied due process of law in violation of the Fifth and Fourteenth Amendments to the United States Constitution when the lower courts failed to supperss [sic] statements made during the course of an interrogation using an unqualified interpreter unfamiliar [sic] with Petitioner's constitutional rights.
>
> **Ground Two:** The right to a motion of acquittal under Criminal Rule 29 is paramount in the interest of justice under due process of law. Petitioner's Fifth and Fourteenth Amendments to the United States Constitution are violated when the State is unable to prove each element of a crime where the manifest weight and sufficiency to establish a violation of R.C. 2925.11.

(Petition, ECF No. 3, PageID 37, 40.)

On direct appeal, the Second District Court of Appeals recited the following underlying facts:

> {¶ 3} On October 8, 2014, Montgomery County Sheriff's Deputy, Joseph Caito, was on duty with his canine partner, Gunner, and was located on Interstate 75 near State Route 35 in Montgomery County, Ohio. Caito was not randomly patrolling; he had been told that Detective Walters, a narcotics investigator for Homeland Security, had received information that a white van from Indiana was going to be bringing illegal drugs into Montgomery County. Both Caito and Gunner were certified in narcotics patrol, including detection of narcotic drugs such as mushrooms, ecstasy, heroin, methamphetamine, and crack-cocaine.
>
> {¶ 4} Caito sat on the highway until the van was picked up, and followed it from there. The vehicle was a white Chevrolet van, with an Indiana registration. Caito observed the van violating the space between vehicles, and initiated a traffic stop at around Edwin C. Moses Boulevard, once the vehicles had cleared a construction area.
>
> {¶ 5} Once Caito stopped the vehicle, he contacted the occupants, informed them of the reason for stopping, and asked them for identifying documents or information to identify who they were. He

---

[1] Petitioner did not file on the standard form for § 2254 petitions, but is entitled to liberal construction of his pleadings because he is proceeding *pro se*. *Haines v. Kerner,* 404 U.S. 519, 520-21 (1972); *Estelle v. Gamble,* 429 U.S. 97, 106 (1976); *McNeil v. United States,* 508 U.S. 106, 113 (1993).

learned that neither the driver (later identified as Joel Flores Lopez) nor the passenger (Eleazar Flores-Lopez) had an issued driver's license.

{¶ 6} Caito's suspicions were aroused by the fact that the car was a "a third-party car," which means that a car is registered to one person but the owner is not in the vehicle. Another indicator was that the driver said the men were in the area looking for construction-type work. However, based on Caito's experience in highway patrol and seeing this type of activity in the county, he did not believe the men were in the area for that type of work because of the lack of tools in the vehicle. In addition, neither man had any identification.

{¶ 7} Caito called for backup, which arrived within five or six minutes, and then deployed Gunner for a free-air sniff. He began at the front driver's side of the vehicle, put Gunner in a sitting position, and gave Gunner the command to sniff the exterior of the car. Gunner alerted to the passenger's side rear door of the van.

{¶ 8} As soon as Caito opened the sliding rear door, he saw a small black carry-on style suitcase on the floorboard directly behind the front two seats, but in front of the two captains' chairs or middle occupant seats. The suitcase was within arm's reach of the driver and passenger, and would have been accessible from a seated position in either the driver's or passenger's seat, without the need to get out of the seat.

{¶ 9} When Caito picked up the suitcase, the first thing he noticed was its weight. It seemed to be a little bit heavy for the size of the suitcase. Once Caito opened the suitcase, he saw that the top layer consisted of men's clothing. As Caito began to move the clothes back, he saw two large packages wrapped in duct tape. Based on his experience, Caito knew the content of the packages would be either drugs or illegal currency. Caito then took the suitcase back to the hood of his patrol car, removed the packages, and made sure there were no more packages.

{¶ 10} The clothing in the suitcase was sized similarly to the clothing worn by Eleazar (medium-size), and to the clothing worn by Joel (larger clothing). The items found in the suitcase included three extra-large shirts, a medium-sized shirt, a pair of jeans size 33 by 32, another pair of jeans sized 34, a large pair of underwear, a medium pair of underwear, and a towel. At the time of the stop, Eleazar was wearing a medium shirt and pants that were size 32 by

30. The drugs were contained in taped bundles that were wrapped up in the clothing and a towel.

{¶ 11} Caito also found two cell phones, a wallet containing $639, two money orders in the amount of $500 each that had not been cashed, and a Wells Fargo receipt indicating a $2,000 deposit. Caito indicated that this type of evidence was typical for the narcotics world, as Wells-Fargo was a "go-to" bank for illegal drug sales deposits.

{¶ 12} Detective Walters searched the van after it was impounded. Among other things, he found a Walmart bag containing size medium cold-weather gloves, a medium sweatshirt with tags, and size medium-large sweatpants. The bag did not contain any underwear.

{¶ 13} Eleazar and his brother, Joel, were arrested and interviewed. Eleazar was interviewed by Brian Turk, a special agent for Homeland Security. Because Eleazar did not speak English, an employee of the Montgomery County Sheriff's office, Shelly Diaz, was brought in to interpret. Diaz was not a certified interpreter; she worked as a bookkeeper in the foreclosure department. However, she was fluent in Spanish and had been asked to translate in other cases.

{¶ 14} Turk advised Eleazar of his *Miranda* rights prior to the interview, but did not record the reading of the rights because the protocol for Homeland Security at the time was to not record interviews. However, Turk learned that this would likely be a state prosecution, and recorded the rest of the interview.

{¶ 15} During the interview, Eleazar stated that he had lived in Arizona for 14 years, and had arrived in Indianapolis where his brother, Joel, lived, about three days before the traffic stop. He claimed Joel had met a man named Edgar at Home Depot, and Edgar had offered them employment doing construction work in Dayton for a month. Although Eleazar did not know Edgar's last name, they had followed him from Indianapolis to Dayton. Edgar was driving a 2004 or 2005 red Ford Lobo F-150 pickup truck. During the drive, Edgar was guiding them by phone and telling them where to go.

{¶ 16} Eleazar further stated that on the morning of October 8, 2014, he and Joel met Edgar at Walmart, and left from there around 9:00 or 9:30 a.m. At Walmart, Edgar told them to take a backpack or suitcase in the back of their van. Edgar threw it in the back, and Eleazar then pushed it further inside the van. Eleazar told Turk that

he did not ask what was in the suitcase and denied knowing it contained drugs until Officer Caito opened it.

{¶ 17} Matthew Fox, a forensic chemist from the Miami Valley Regional Crime Lab, tested the packages from the van for the presence of controlled substances. Fox, who was qualified as an expert, stated that he weighed the packages before testing. The gross weight of the sample, plus packaging, was 3,660 grams, plus or minus ten grams. Of this total amount, Fox tested one sample that was 444 grams plus or minus four grams. The bulk amount of methamphetamine in Ohio is 3 grams. Fox tested only the sample weighing 444 grams because that amount was over 100 times the bulk amount.

{¶ 18} Fox used three tests that are the generally accepted methods of testing drugs in the scientific community. These tests included a sodium nitroprusside color test, a marquis color test, and gas chromatography-mass spectrometry ("GCMS") testing. The nitroprusside test checks for the presence of a compound called secondary aliphatic amines. If that compound is present, the test will obtain a blue reaction, which it did in this case.

{¶ 19} The second test was a marquis color test, which produces a variety of colors depending on various compounds that may be present. An orange reaction was produced, which is consistent with methamphetamine. Finally, Fox performed the GCMS test. In this test, a gas chromatograph separates out different compounds of a mixture. Mass spectrometry is then used to identify the compounds that are present. The GCMS test identified methamphetamine, which is a Schedule II drug.

{¶ 20} Fox did not test the remaining drugs, but checked each bundle and determined that the substances in the bags were consistent in nature with the bag that he tested. These substances did not differ in color, texture, or consistency from the tested drugs.

{¶ 21} On October 17, 2014, Eleazar and his brother, Joel, were indicted for one count of Possession of Drugs (Methamphetamine) in an amount equaling or exceeding 100 times the bulk amount, in violation of R.C. 2925.11(A). This count contained a specification that they were major drug offenders in that the offense involved a drug included in Schedule I or II, other than marijuana, that consisted of at least 100 times the bulk amount.

{¶ 22} Prior to trial, Eleazar filed motions to suppress, including a motion to suppress statements that he made during his interview.

> After hearing testimony from several witnesses, including Diaz, Caito, Turk, and Bill Hargis, an interpreter who had been certified by the Supreme Court of Ohio, the trial court overruled the motion to suppress.
>
> {¶ 23} At the jury trial, Joel testified on behalf of his brother. Joel had already been convicted as charged, following a jury trial. *State v. Joel Flores-Lopez*, 2d Dist. Montgomery No. 26964, 2016-Ohio-7687 (Nov. 10, 2016). Joel testified that he had met Edgar before Eleazar arrived in town, and Edgar told him then that he had possible construction work available in Dayton. Three days later, after Eleazar arrived, Joel again met with Edgar. Edgar said there would be enough work for a month, and they would make about $200 per day each. Joel stressed that he was the one who made the deal with Edgar, not Eleazar.
>
> {¶ 24} Joel also indicated that the suitcase belonged to Edgar, and that Edgar asked them to put it in their truck because his own truck was full. Because Joel was busy at the moment, Eleazar put the suitcase in the van. In addition, Joel denied knowing there were drugs in the suitcase.
>
> {¶ 25} Joel stated that he had never been to Dayton before, and that Edgar told him that when they arrived, they were to find a store like Home Depot and Edgar would call them. Finally, Joel said he did not bring clothing with him, but had bought clothing, including underwear, gloves, and hats at Walmart.
>
> {¶ 26} The jury found Eleazar guilty as charged, and the trial court sentenced him as noted above. Eleazar now appeals from his conviction and sentence

*State v. Flores-Lopez*, 2017-Ohio-690, 85 N.E.3d 534 (2nd Dist. Feb. 24, 2017).

**Ground One: Failure to Grant Motion to Suppress**

In his First Ground for Relief asserts his Due Process rights were violated when the trial court refused to suppress his statements to police on the initial traffic stop. He presented this claim to the Second District Court of Appeals on direct appeal and that court decided the claim as follows:

6

{¶ 27} Eleazar's First Assignment of Error states that:

The Trial Court Erred by Failing to Grant Defendant Eleazar Flores Lopez's ("Flores-Lopez") Motion to Suppress Statements Made in the Course of an Interrogation Using an Unqualified Interpreter.

{¶ 28} Under this assignment of error, Eleazar argues that the trial court should have granted his motion to suppress because he was not provided with a certified or qualified interpreter. After hearing the testimony at the hearing, the trial court overruled the motion to suppress. In particular, the court found the interpreter, Diaz, credible when she said she had advised Eleazar of his *Miranda* rights. As a result, the court concluded there was no violation of Eleazar's rights. The court further observed that a certified language interpreter need not be used in out-of-court-proceedings, and that while the expert witness criticized Diaz in some respects, the criticism did not rise to such a level that would cause Diaz's translation to be inadequate. The court did note that some of the statements might be inadmissible on a case-specific basis, and that the court would entertain a motion in limine in that regard. No such motion was filed, and no objections were raised at trial to any specific statements.

{¶ 29} "Appellate review of a motion to suppress presents a mixed question of law and fact. When considering a motion to suppress, the trial court assumes the role of trier of fact and is therefore in the best position to resolve factual questions and evaluate the credibility of witnesses." (Citation omitted.) *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8. "Consequently, an appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence. . . . Accepting these facts as true, the appellate court must then independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard." (Citations omitted.) *Id.*

{¶ 30} After applying these standards, we conclude that the trial court did not err in denying the motion to suppress. Under the Fifth Amendment of the Constitution, no person can be compelled to testify against himself, and those who are accused have a right to the assistance of counsel. "In light of the inherent coercion involved in custodial interrogation, *Miranda* established 'a set of prophylactic measures' to safeguard the constitutional privilege against self-incrimination." *State v. Barker*, 2016-Ohio-2708, ¶ 22, 149 Ohio St. 3d 1, 73 N.E.3d 365, quoting *J.D.B. v. North Carolina*, 564 U.S. 261, 269 (2011), which in turn cites *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

{¶ 31} "In broad terms, *Miranda* held that the state may not use a defendant's statements from custodial interrogation 'unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination.'" *Barker* at ¶ 22, quoting *Miranda*, [386 U.S.] at 444. "Prior to questioning, the police must warn the suspect 'that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed.' *Id.* The Supreme Court recognized the importance of a suspect's 'real understanding' of his rights and his intelligent decision whether to exercise them." *Barker* at ¶ 22, quoting *Miranda* at 469.

{¶ 32} In *Barker*, the court further observed that:

> If custodial interrogation continues in the absence of an attorney after a police officer advises a suspect of his rights, the government bears "a heavy burden" to demonstrate by a preponderance of the evidence that the suspect "knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel" before speaking to the police. *Miranda* at 475, 86 S.Ct. 1602, citing *Escobedo v. Illinois*, 378 U.S. 478, 490, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964), fn. 14 . . . . . . . A court may not presume a valid waiver either from the suspect's silence after warnings are given or from the fact that the suspect eventually confessed. *Miranda* at 475, 86 S.Ct. 1602. Rather, the record must show "'that an accused was offered counsel but intelligently and understandingly rejected the offer. Anything less is not waiver.'" *Id.*, quoting *Carnley v. Cochran*, 369 U.S. 506, 516, 82 S.Ct. 884, 8 L.Ed.2d 70 (1962). If the state does not satisfy its burden, "no evidence obtained as a result of interrogation can be used." *Id.* at 479, 86 S.Ct. 1602.

(Citations omitted.) *Barker* at ¶ 23. Courts consider the totality of the circumstances in deciding if suspects have "knowingly, intelligently, and voluntarily waived" their *Miranda* rights. (Citation omitted.) *Id.* at ¶ 24.

{¶ 33} In support of his argument that the motion to suppress should have been granted, Eleazar cites *State v. Ramirez*, 135 Ohio App.3d 89 (11th Dist. 1999). In *Ramirez*, the defendant's murder conviction was reversed, based on flaws in an interpreter's translation of the defendant's *Miranda* rights. Like Diaz, the interpreter in *Ramirez* was not certified, but had taken Spanish in college and had lived in

Mexico for six months. *Id.* at 91. However, in contrast to the procedure used in the case before us, the police in *Ramirez* instructed the interpreter to read the defendant his *Miranda* rights using a *Miranda* card that was written in English. *Id.* While doing so, the interpreter made a number of significant errors and also failed to tell the defendant of certain rights that he had, including having an attorney present during questioning, and that if the defendant spoke to police, his statements could be used against him in court. *Id.* at 94.

{¶ 34} In contrast, the Montgomery County Sheriff's Office has a pre-interview form setting forth the waiver of rights in Spanish and containing a waiver of rights paragraph in Spanish. As the trial court noted, Diaz used this form when advising Eleazar of his rights. Decision and Entry Overruling Defendant's Motion to Suppress, Doc. #38, p. 4.

{¶ 35} Courts have also stressed that "[a] translation of a suspect's *Miranda* rights need not be perfect or verbatim if the suspect understands that he need not speak to the police, that any statement made may be used against him, that he has a right to an attorney, and that an attorney will be appointed if he cannot afford one." *State v. Ramirez-Garcia*, 141 Ohio App.3d 185, 188, 2001 Ohio 4206, 750 N.E.2d 634 (12th Dist. 2001), citing *Duckworth v. Eagan*, 492 U.S. 195, 210-215, 109 S.Ct. 2875, 106 L.Ed.2d 166 (1989). (Other citations omitted.)

{¶ 36} The transcript of the suppression hearing indicates that Eleazar had twelve years of schooling, that he read each of the five *Miranda* rights from the pre-interview form, and that he read the waiver of rights paragraph. Eleazar had no difficulty reading the waiver of rights paragraph. In addition, Diaz used the pre-interview form written in Spanish when advising Eleazar of his rights. Eleazar agreed to speak with the police and signed the form waiving his rights. There was also no evidence of coercion or physical threats, nor was there any evidence that Eleazar was under the influence of drugs or alcohol. The totality of the circumstances indicate that Eleazar knowingly, voluntarily, and intelligently waived his *Miranda* rights.

{¶ 37} Regarding the content of the interview itself, Eleazar's expert criticized Diaz during the suppression hearing for having asked questions on her own that were not asked by the law enforcement official. The expert described this as demonstrating a lack of impartiality. In addition, the expert criticized Diaz for expressing opinions in some instances, for occasionally failing to interpret

things that Eleazar said back into English, and for speaking at times about Eleazar in the third person. The trial court did not find a pattern or that this was done on a broad scale. However, the trial court did indicate that Eleazar could file a motion in limine to exclude particular statements, which Eleazar failed to do. Eleazar also failed to object at trial to any portion of Special Agent Turk's testimony about the interrogation. In particular, at trial, Turk recounted statements that Eleazar had made during the interrogation.

{¶ 38} To the extent that Eleazar's objection is based on the prejudicial or irrelevant nature of his statement to the police, the failure to object at trial waived all but plain error. *State v. Jones*, 91 Ohio St.3d 335, 343, 2001 Ohio 57, 744 N.E.2d 1163 (2001), citing *State v. Joseph*, 73 Ohio St.3d 450, 455, 1995 Ohio 288, 653 N.E.2d 285 (1995). "'Plain error does not exist unless, but for the error, the outcome at trial would have been different.'" *Id.* In this regard, our review of the record indicates no error, let alone plain error. Eleazar basically indicated that he and his brother were coming to Dayton at the request of Edgar, to do construction work, that the deal for the work was between Joel and Edgar, and that Eleazar did not know what was in the suitcase until Officer Caito opened the suitcase.

{¶ 39} Furthermore, even if the objection is to the alleged errors during the interrogation, the law does not require certified interpreters to be furnished during out-of-court proceedings. For example, R.C. 2311.14(A) requires only that courts appoint "qualified interpreters" for witnesses or parties *during legal proceedings*, where the party or witness "cannot readily understand or communicate . . . . " (Emphasis added.)

{¶ 40} Sup.R. 88(A) also requires appointment of foreign language interpreters in "*a case or court function . . . .* " (Emphasis added.) In this situation, Ohio Supreme Court certified foreign language interpreters are required, except where exceptions in Sup.R. 88(D)(2)-(4) apply. For example, certified foreign language interpreters are not required in certain court proceedings, including where such interpreters do not exist or are not reasonably available. Sup.R. 88(D)(1)-(2).

{¶ 41} Courts instead, may use provisionally qualified foreign language interpreters, or language-skilled foreign language interpreters to participate in-person in cases or court functions, or courts may, in some situations, use interpreters who participate through "through telephonic interpretation." Sup.R. 88(D)(3)-(4).

{¶ 42} Notably, neither the statute nor the Superintendence Rule requires that certified foreign language interpreters be used in out-of-court proceedings. Eleazar has provided no case law indicating otherwise, and we agree with the trial court that even though the translator was not perfect, there was no pattern of poor performance or any significant issue.

{¶ 43} Based on the preceding discussion, the First Assignment of Error is overruled.

2017-Ohio-690.

When a state court decides on the merits a federal constitutional claim later presented to a federal habeas court, the federal court must defer to the state court decision unless that decision is contrary to or an objectively unreasonable application of clearly established precedent of the United States Supreme Court. 28 U.S.C. § 2254(d)(1); *Harrington v. Richter*, 562 U.S. 86, 99-100 (2011); *Brown v. Payton,* 544 U.S. 133, 140 (2005); *Bell v. Cone*, 535 U.S. 685, 693-94 (2002); *Williams (Terry) v. Taylor,* 529 U.S. 362, 379 (2000).

In *Garner v. Mitchell*, the Sixth Circuit summarized the federal law governing federal habeas corpus claims arising out of the United States Supreme Court's decision in *Miranda v. Arizona*, 384 U.S. 436 (1966), as follows:

> [A habeas petitioner] has the burden of establishing that, under the totality of the circumstances, he did not knowingly and intelligently waive his rights before speaking to the police. *Clark v. Mitchell*, 425 F.3d 270, 283 (6th Cir. 2005). "We are also mindful that in a habeas proceeding the petitioner 'has the burden of establishing his right to federal habeas relief . . . .'" *Caver v. Straub*, 349 F.3d 340, 351 (6th Cir. 2003) (quoting *Romine v. Head*, 253 F.3d 1349, 1357 (11th Cir. 2001)). Under this inquiry, we examine "the particular facts and circumstances surrounding [the] case, including the background, experience, and conduct of the accused." *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938); *see also Edwards v. Arizona*, 451 U.S. 477, 482 (1981). The relevant question is not whether the "criminal suspect [knew] and [understood] every possible consequence of a waiver of the Fifth Amendment privilege," but rather whether the "suspect [knew] that he [could] choose not to talk

> to law enforcement officers, to talk only with counsel present, or to discontinue talking at any time." *Colorado v. Spring*, 479 U.S. 564, 574 (1987).
>
> . . .
>
> It is well-established [sic], in this circuit and others, that mental capacity is one of many factors to be considered in the totality of the circumstances analysis regarding whether a *Miranda* waiver was knowing and intelligent. Thus, diminished mental capacity alone does not prevent a defendant from validly waiving his or her *Miranda* rights. [Citations omitted.] Rather, that factor must be viewed alongside other factors, including evidence of the defendant's conduct during, and leading up to the interrogation.

557 F.3d 257, 260-61, 264 (6th Cir. 2009) (parallel citations omitted.) The court explained that the original purpose of the *Miranda* decision was to "'reduce the likelihood that the suspects would fall victim to constitutionally impermissible practices of police interrogation.'" *Id*. at 262, *quoting New York v. Quarles*, 467 U.S. 649, 656 (1984).

In his argument in support of his First Ground for Relief, Flores-Lopez seems to argue that he was entitled to an interpreter who was also an attorney. However, the right to appointed counsel does not attach at that stage of proceedings, but only when formal charges are made. To put it another way, there is no constitutional right to have an appointed attorney during police interrogation. There is also no constitutional requirement that an interpreter have any training in law at all. Nor is this a case where a criminal defendant invoked his right to remain silent until consulting with an attorney and the police persisted in interrogation.

Petitioner does not dispute the findings of the Second District that he had twelve years of schooling and he read the Miranda warnings in Spanish and then signed the waiver form. *State v. Flores-Lopez*, 2017-Ohio-690, ¶ 36. The Second District also considered the testimony from Petitioner's expert witness that the translation was not perfect, but found that it was good enough to communicate the rights involved.

In sum, Petitioner has not shown that the Second District applied the wrong legal standard

or that its decision was based on an unreasonable determination of the facts in light of the evidence presented. This Court should defer to the Second District Court of Appeals and dismiss the First Ground for Relief.

**Ground Two: Conviction Against the Manifest Weight of the Evidence and Not Supported by Sufficient Evidence**

In his Second Ground for Relief, Flores-Lopez claims his conviction is against the manifest weight of the evidence and unsupported by sufficient evidence to convict.

The manifest weight claim is not a constitutional claim which this Court can consider in habeas corpus. *Johnson v. Havener*, 534 F.2d 1232 (6th Cir. 1986). However, an allegation that a verdict was entered upon insufficient evidence states a claim under the Due Process Clause of the Fourteenth Amendment to the United States Constitution. *Jackson v. Virginia,* 443 U.S. 307 (1979); *In re Winship*, 397 U.S. 358 (1970); *Johnson v. Coyle*, 200 F.3d 987, 991 (6th Cir. 2000); *Bagby v. Sowders*, 894 F.2d 792, 794 (6th Cir. 1990)(en banc). In order for a conviction to be constitutionally sound, every element of the crime must be proved beyond a reasonable doubt. *In re Winship*, 397 U.S. at 364.

> [T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt . . . . This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence and to draw reasonable inferences from basic facts to ultimate facts.

*Jackson v. Virginia*, 443 U.S. at 319; *United States v. Paige,* 470 F.3d 603, 608 (6th Cir. 2006); *United States v. Somerset*, No. 3:03-po-2, 2007 U.S. Dist. LEXIS 76699 (S.D. Ohio 2007) (Rice, J.). This rule was recognized in Ohio law at *State v. Jenks*, 61 Ohio St. 3d 259 (1991). Of course,

it is state law which determines the elements of offenses; but once the state has adopted the elements, it must then prove each of them beyond a reasonable doubt. *In re Winship, supra.* A sufficiency challenge should be assessed against the elements of the crime, not against the elements set forth in an erroneous jury instruction. *Musacchio v. United States*, 577 U.S. ----, 136 S. Ct. 709(2016).

In cases such as Petitioner's challenging the sufficiency of the evidence and filed after enactment of the Antiterrorism and Effective Death Penalty Act of 1996 (Pub. L. No 104-132, 110 Stat. 1214) (the "AEDPA"), two levels of deference to state decisions are required:

> In an appeal from a denial of habeas relief, in which a petitioner challenges the constitutional sufficiency of the evidence used to convict him, we are thus bound by two layers of deference to groups who might view facts differently than we would. First, as in all sufficiency-of-the-evidence challenges, we must determine whether, viewing the trial testimony and exhibits in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979). In doing so, we do not reweigh the evidence, re-evaluate the credibility of witnesses, or substitute our judgment for that of the jury. See *United States v. Hilliard*, 11 F.3d 618, 620 (6th Cir. 1993). Thus, even though we might have not voted to convict a defendant had we participated in jury deliberations, we must uphold the jury verdict if any rational trier of fact could have found the defendant guilty after resolving all disputes in favor of the prosecution. Second, even were we to conclude that a rational trier of fact could not have found a petitioner guilty beyond a reasonable doubt, on habeas review, we must still defer to the state appellate court's sufficiency determination as long as it is not unreasonable. See 28 U.S.C. § 2254(d)(2).

*Brown v. Konteh*, 567 F.3d 191, 205 (6th Cir. 2009). In a sufficiency of the evidence habeas corpus case, deference should be given to the trier-of-fact's verdict under *Jackson* and then to the appellate court's consideration of that verdict, as commanded by AEDPA. *Tucker v. Palmer*, 541 F.3d 652 (6th Cir. 2008); *accord Parker v. Matthews*, 567 U.S. 37, 43 (2012); *Davis v. Lafler,* 658 F.3d 525,

531 (6th Cir. 2011) (en banc). Notably, "a court may sustain a conviction based upon nothing more than circumstantial evidence." *Stewart v. Wolfenbarger,* 595 F.3d 647, 656 (6th Cir. 2010).

> We have made clear that *Jackson* claims face a high bar in federal habeas proceedings because they are subject to two layers of judicial deference. First, on direct appeal, "it is the responsibility of the jury -- not the court -- to decide what conclusions should be drawn from evidence admitted at trial. A reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury." *Cavazos v. Smith*, 565 U.S. 1, 2 (2011) (per curiam). And second, on habeas review, "a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was 'objectively unreasonable.'" *Ibid*. (quoting *Renico v. Lett*, 559 U.S. 766, 773 (2010)).

*Coleman v. Johnson*, 566 U.S. 650, 651 (2012) (per curiam); *Parker v. Matthews*, 567 U.S. 37, 43 (2012) (per curiam).

Petitioner argues that the evidence against him is only circumstantial. He states that he was riding in the front seat of the van and the suitcase with the amphetamines was in the backseat. He of course asserts any incriminating statements he made to the police should have been suppressed because they were obtained in violation of *Miranda, supra*.

The Second District decided Petitioner's manifest weight and sufficiency claims together, writing:

> {¶ 52} In the case before us, Eleazar was charged with Possession of Drugs (Methamphetamine), in violation of R.C. 2925.11(A). This subsection of the statute provides that "No person shall knowingly obtain, possess, or use a controlled substance or a controlled substance analog" At the time Eleazar was arrested, R.C. 2901.22(B) defined the culpable state of "knowingly" as follows:
>
>> A person acts knowingly, regardless of purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist.

15

{¶ 53} "Possess" or "possession" is defined as "having control over a thing or substance, but may not be inferred solely from mere access to the thing or substance through ownership or occupation of the premises upon which the thing or substance is found." R.C. 2925.01(K). "'Possession of a drug may be either actual physical possession or constructive possession. A person has constructive possession of an item when he is conscious of the presence of the object and able to exercise dominion and control over that item, even if it is not within his immediate physical possession.'" *State v. Dillard*, 173 Ohio App.3d 373, 2007-Ohio-5651, 878 N.E.2d 694, ¶ 53 (2d Dist.), quoting *State v. Mabry*, 2d Dist. Montgomery No. 21569, 2007-Ohio-1895, ¶ 18.

{¶ 54} Whether a person "knowingly possessed . . . a controlled substance is to be determined from all the attendant facts and circumstances available." *State v. Teamer*, 82 Ohio St.3d 490, 492, 1998 Ohio 193, 696 N.E.2d 1049 (1998). Moreover, "[c]ircumstantial evidence and direct evidence inherently possess the same probative value . . . ." *Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492, at paragraph one of the syllabus.

{¶ 55} In view of the preceding discussion, the State did not have to provide direct (or "concrete") evidence of Eleazar's knowledge or possession; the conviction could rest on circumstantial evidence. In *State v. Ruby*, 149 Ohio App.3d 541, 2002-Ohio-5381, 778 N.E.2d 101 (2d Dist.), we held that a reasonable trier of fact could conclude that the defendant constructively possessed drugs, where the defendant had loaned his wife's vehicle to others in the past, including known drug dealers, and his wife had previously removed drug paraphernalia from the vehicle. When the defendant was stopped by the police, the facts indicated that the defendant had loaned his vehicle to a known drug dealer earlier that day. The dealer was also in the car with the defendant. A crack pipe and piece of crack cocaine were recovered from the floor of the rear passenger compartment, behind the driver's seat. *Id.* at ¶ 42-43.

{¶ 56} In addition, we concluded in *Ruby* that the conviction was not against the manifest weight of the evidence. In this regard, we rejected the defendant's argument that he did not know contraband was in the vehicle and that it had been placed there by the drug dealer. *Id.* at ¶ 44. Again, we relied on circumstantial evidence. *Id.* at ¶ 36.

{¶ 57} In the case before us, the suitcase containing the drugs was located in close proximity to Eleazar's seat. The suitcase also

contained clothing that was consistent with the two different clothing sizes worn by Eleazar and his brother. In addition, we note that Eleazar moved the suitcase closer to the front of the vehicle after it was placed in the van by Edgar. Officer Caito observed that the suitcase was heavier than one would expect if it only contained clothing. Again, while this evidence is circumstantial, direct evidence of Eleazar's knowledge need not be provided.

{¶ 58} As a further matter, Joel's testimony failed to aid Eleazar. Although Joel testified that he was the one who made the deal for work with Edgar, Joel also testified that he did not bring any clothing with him and had purchased underwear at Walmart. However, no underwear was found in the Walmart bag; instead, the bag contained only gloves, a sweatshirt, and sweatpants. The fact that no underwear was found in the bag casts doubt on Joel's credibility. We also stress that a pair of men's medium underwear (a size that would fit Eleazar) was found in the suitcase, along with a pair that would have fit Joel. It is difficult to believe that people would travel to a city where they intended to work for a month, without bringing a change of underwear.

{¶ 59} Eleazar also said in his statement that Edgar was traveling alone. While it is possible that Edgar packed two different sizes of men's underwear and clothing for himself, it is an unlikely coincidence that the clothing in the suitcase was also consistent with the sizes worn by Eleazar and Joel.

{¶ 60} Eleazar's final argument is that the judgment was against the manifest weight due to discrepancies between the testimony of Officer Caito and Detective Walters about the presence of a middle row of captains' chairs in the vehicle. According to Caito, the suitcase with the drugs was on the floorboard directly behind the two front seats and in front of two captains' chairs, or middle occupant seats. Transcript of Proceedings, Vol. II, p. 286.

{¶ 61} In contrast, Detective Walters testified that when he searched the van on September 15, 2015, there were only two seats inside the vehicle. Transcript of Proceedings, Vol. I, p. 219, referencing State's Ex. 5. Officer Caito looked at the same photograph and stated that the only difference between the way the van looked on the day of the stop and in Ex. 5 was that the suitcase in Ex. 5 was not located where he initially found it. Transcript of Proceedings, Vol. II, p. 295. At that latter point, the suitcase was in the back of the van, in front of a spare tire. *Id.* at 296. The following exchange then occurred:

> Q. Okay. And then could you describe where you located the suitcase when you conducted the search of the vehicle?
>
> A. Yes, the two chairs that you're seeing in the middle of the car there are what's called "captains' chairs." Those are rear occupant seats. Directly in front of those, on the floorboard, is where the suitcase was initially located, which would basically be between the middle occupant seats and the backs of the front driver and passenger seats.

*Id.* at p. 296, referring to State's Ex. 5.

{¶ 62} Officer Caito was emphatic about what he originally saw and where the suitcase was located on the day of the traffic stop. He also stated that there were four seats in the van as shown on Exhibit 5, and that if anyone said there were two seats, that person would be wrong. *Id.* at p. 313. In contrast, Detective Walters was not present at the time of the stop and only viewed the suitcase and van nearly a year later, when he conducted a search. His testimony was also not detailed and was somewhat ambiguous.

{¶ 63} "In either a criminal or civil case the weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts." *State v. DeHass*, 10 Ohio St.2d 230, 231, 227 N.E.2d 212 (1967). "A jury, as finder of fact, may believe all, part, or none of a witness's testimony." (Citations omitted.) *State v. Jackson*, 8th Dist. Cuyahoga No. 93235, 2010-Ohio-3716, ¶ 16. *See also State v. Howard*, 11th Dist. Lake No. 2009-L-158, 2010-Ohio-2817, ¶ 33 (noting that even if testimony of two officers is inconsistent, a trier of fact is entitled to decide credibility and believe all, part, or none of a witness's testimony).

{¶ 64} As a final matter, whether there were captains' chairs or not is irrelevant. Specifically, Joel testified that the suitcase was located where both he and Eleazar could reach back and touch it. Transcript of Proceedings, Vol. II, pp. 458-459.

{¶ 65} Based on the preceding discussion, the trial court did not err in denying Eleazar's Crim.R. 29 motion for acquittal, as the State presented sufficient evidence to sustain a conviction for the offense charged. In addition, the conviction was also not against the manifest weight of the evidence. Accordingly, the Second and Third Assignments of Error are overruled.

*State v. Flores-Lopez* 2017-Ohio-690.

Reviewing the Second District's decision under the doubly deferential standard required by precedent, the Magistrate Judge cannot say that that decision was an objectively unreasonable application of *Jackson v. Virginia*, 443 U.S. 307 (1979). Therefore, the Second Ground for Relief should also be dismissed with prejudice.

**Conclusion**

Based on the foregoing analysis, the Magistrate Judge respectfully recommends that the Petition be dismissed with prejudice. Because reasonable jurists would not disagree with this conclusion, Petitioner should be denied a certificate of appealability and the Court should certify to the Sixth Circuit that any appeal would be objectively frivolous and therefore should not be permitted to proceed *in forma pauperis*.

October 2, 2018.

s/ *Michael R. Merz*
United States Magistrate Judge

**NOTICE REGARDING OBJECTIONS**

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within fourteen days after being served with this Report and Recommendations. Pursuant to Fed. R. Civ. P. 6(d), this period is extended to seventeen days because this Report is being served by mail. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections

within fourteen days after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn*, 474 U.S. 140, 153-55 (1985); *United States v. Walters*, 638 F.2d 947, 949-50 (6th Cir. 1981).